# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MICHAEL PERRY,** | * | |
| **Plaintiff** | * | |
| v. | * | Civil Action No. PWG-16-705 |
| **THOMAS BARNES,** *et al.*, | * | |
| **Defendants** | * | |

## MEMORANDUM OPINION AND ORDER

In this civil rights action, Plaintiff Michael Perry alleges that, when he was a pretrial detainee, Defendants Thomas Barnes, Derrick Brown, William Bunn, Charles Giles, Charnel Hines, Michael Moore, and John Doe failed to protect him from an attack by other detainees and Defendants Remigius Ogbonna and Cynthia McNeely were deliberately indifferent to his serious medical needs that resulted from the attack. Second Am. Compl., ECF No. 37. Defendants have moved to dismiss or, alternatively, for summary judgment. ECF No. 40.[1] Because Perry sufficiently states his claims and Defendants are not entitled to qualified immunity, and given that Perry has shown that he needs additional discovery to oppose a motion for summary judgment, Defendants' motion will be treated as a motion to dismiss and denied.

## Background

In 2014, following the shooting of Perry's stepbrother by members of the Black Guerilla Family ("BGF") gang and Perry's agreement to cooperate with the prosecutors, "BGF gang

---

[1] Defendants filed a Memorandum in support of their Motion, ECF Nos. 40-1, and Perry, with the assistance of pro bono counsel, filed an Opposition, ECF No. 42. Defendants have not filed a reply, and the time for doing so has passed. *See* Loc. R. 105.2(a). A hearing is not necessary. *See* Loc. R. 105.6.

members targeted [Perry] for retaliation." Second Am. Compl. ¶ 18. Later in 2014, Perry spent time incarcerated at Baltimore Central Booking and Intake Center ("Central Booking") and at the Baltimore City Detention Center ("BCDC"), where he was "in constant danger" due to BGF's "considerable presence and influence at the BCDC." *Id.* ¶¶ 19–20.[2] After he was arrested again on August 7, 2015, Perry "was a pretrial detainee in the custody of the Maryland Department of Public Safety and Correctional Services" ("DPSCS"), housed in Central Booking. Second Am Compl. ¶¶ 2, 25.

Perry was "targeted as part of a planned attack by BGF members" on August 29, 2015. *Id.* At the time, Defendant Barnes was the Central Booking Security Chief; Defendants Brown and Bunn were DPSCS corrections officers, with Brown serving as the shift Commander at Central Booking and Bunn serving as the shift supervisor at Central Booking; Defendant Giles was a DPSCS Institutional Investigator; and Defendants Hines and Moore were intelligence officers at Central Booking. *Id.* ¶¶ 7–12, 27. Bunn "received information from a confidential informant that a 'war' was going to occur between BGF members and other detainees and that Mr. Perry was one of the detainees who would be targeted by BGF." *Id.* ¶ 27. He "contacted the Intelligence Division," *id.*, and Giles, Moore, and Hines investigated, after which Barnes ordered that Perry and "four other detainees" (three of whom were BGF members) be transferred to BCDC, *id.* ¶ 28. Brown, Giles, Hines, and "several escorting officers" executed that order. *Id.* ¶ 28.

Perry alleges that "Barnes, Brown, Bunn, Giles, Hines, and Moore had actual knowledge that BGF members had planned to fight with other detainees, including Mr. Perry, on the night of August 29, 2015," Second Am. Compl. ¶ 30, and that night, aware that Perry was targeted, these

---

[2] With his Second Amended Complaint, Perry filed articles from the Baltimore Sun, the Washington Post, and www.vice.com, as well as a criminal indictment describing the BGF and its presence in Maryland prisons. *See* ECF Nos. 37-1 – 37-7.

2

Defendants "moved Mr. Perry to another building without ensuring he would be protected from the BGF at the new location." *Id.* ¶ 2. Specifically, they "housed him with the general population" in the 700 South Dorm in the Jail Industries Building at BCDC, which "had an open floor plan, which allowed inmates to move about with relative ease." *Id.* ¶ 31. Perry claims that, "[u]pon information and belief, Defendants Barnes, Brown, Bunn, Giles, Hines, and Moore did not investigate whether there were any BGF members in the 700 South dorm or whether Mr. Perry would be safe there." *Id.*

Perry arrived at his new dorm and, within half an hour, he "was brutally attacked by several BGF members" who "stabbed [him] in multiple places on his head and back, [and] punched, kicked, stomped on, and hit [him] in the head." Second Am. Compl. ¶ 2; *see id.* ¶¶ 34–35. This caused Perry to "bleed[] profusely from his head and back wounds and suffer[] from a fractured nose, a contused arm, and a broken tooth." *Id.* ¶ 2; *see id.* ¶¶ 34–35.

Sergeant Remigius Ogbonna, who "was the Officer in Charge of the Jail Industries building when Mr. Perry was attacked," and other corrections officers responded to the scene, and two corrections officers "escorted Mr. Perry to medical." Second Am. Compl. ¶¶ 13, 37. Only one registered nurse was on site; no doctors were. *Id.* ¶ 38. The nurse "attempted to clean Mr. Perry's wounds and stop the bleeding" but "did not have the necessary supplies to treat him or to evaluate his head injury," so she "informed the corrections officers that they needed to call 911 and get Mr. Perry to the hospital immediately"; she also had a physician's assistant come evaluate Perry. *Id.* The physician's assistant "recommended that Mr. Perry receive a CT scan." *Id.*

> Despite the recommendation from a medical professional that they needed to call 911, and despite knowing that Mr. Perry had suffered a head injury that required a CT scan, was bleeding, and was in considerable pain, BCDC personnel — including, upon information and belief, Defendants Remigius Ogbonna and Cynthia McNeely [a DPSCS corrections officer] — did not call an ambulance.

> Instead, they interrogated Mr. Perry about the identities of his attackers for almost two hours. Ogbonna took pictures of Mr. Perry's injuries.

*Id.* ¶ 39; *see id.* ¶ 14.

## Standard of Review

Defendants style their dispositive motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011). Generally, the Court may treat a motion to dismiss as a motion for summary judgment pursuant to Rule 12(d), if it gives "[a]ll parties . . . a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). But, if the party opposing a summary judgment motion "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it." Fed. R. Civ. P. 56(d).

Here, Defendants filed Chapter 10, Medical Autonomy, of the DPSCS *Office of Clinical Services/Inmate Health Administrative Manual* as Exhibit 1 to their motion, ECF No. 40-3, to support their argument that Defendants Ogbonna and McNeely had no responsibility for Perry's medical needs, *see* Defs.' Mem. 14, 17. Perry submits the Declaration of his counsel, Dia Rasinariu, who states that "[t]here has been no discovery into Baltimore City Detention Center's policies for responding to medical emergencies," and asserts that "[s]uch discovery would allow Plaintiff to determine how or if the DPSCS *Office of Clinical Services/Inmate Health Administrative Manual Chapter 10 Medical Autonomy* applies to his situation." Rasinariu Decl. ¶ 8, ECF No. 42-1. She also notes that "Plaintiff has not yet had the opportunity to serve interrogatories upon or depose Defendants Ogbonna and McNeely" or the nurse or physician's

assistant who saw Perry after the incident "to determine whether Defendants Ogbonna and McNeely followed the relevant policies in their response to Plaintiff's medical emergency." *Id.* ¶ 9. In light of these assertions, I will only consider Defendants' motion as a motion to dismiss. *See* Fed. R. Civ. P. 56(d).

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Velencia v. Drezhlo*, No. RDB–12–237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012). This rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). To that end, the Court bears in mind the requirements of Fed. R. Civ. P. 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79. *See Velencia*, 2012 WL 6562764, at *4 (discussing standard from *Iqbal* and *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

**Discussion**

Plaintiff's Second Amended Complaint presents three claims under 42 U.S.C. § 1983 that Defendants violated his constitutional rights: a claims for failure to protect against Barnes, Brown, Bunn, Moore, Giles and Hines, a claim against John Doe (who has not been served and is not a

5

part of the pending motion) for failure to protect, and a claim for deliberate indifference to medical needs against Ogbonna and McNeely. A suit under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). To state a claim under § 1983, a plaintiff must allege that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). It is undisputed in this case that, at all relevant times, Defendants acted under color of state law.

The Due Process Clause of the Fourteenth Amendment protects the rights of pretrial detainees, such as Perry. *Hill v. Nicodemus*, 979 F.2d 987, 990-91 (4th Cir. 1992). The constitutional protections afforded to a pretrial detainee under the Fourteenth Amendment are similar to those provided by the Eighth Amendment for postconviction detainees. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Hill*, 979 F.2d at 991 ("Due process rights of a pretrial detainee are at least as great as the eighth amendment protections available to the convicted prisoner."). This Court consistently has noted that when a pretrial detainee brings a Fourteenth Amendment failure-to-protect claim, the same standards apply as for an Eighth Amendment claim brought by a convicted prisoner. *See, e.g., McClellan v. Monyei*, No. PWG-17-3307, 2019 WL 859217, at *6 (D. Md. Feb. 21, 2019) (citing *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001)); *McFadden v. Butler*, No. TDC-16-0437, 2018 WL 1394021, at *4 (D. Md. Mar. 19, 2018) (citing *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013)); *Kamara v. Prince George's County Dep't of Corr.*, No. ELH-15-3952, 2017 WL 735549, at *12 (Feb. 24, 2017) (collecting cases).

Thus, to state his claims for violations of the Fourteenth Amendment based on failure to

protect and deliberate indifference to medical needs, Perry must allege Defendants' "'deliberate indifference' to a substantial risk of serious harm to him." *McFadden v. Allison*, No. WDQ-08-0154, 2009 WL 3247358, at *4 (D. Md. Oct. 9, 2009) (citing *Parrish ex. rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004), and noting that the standard is the same for Eighth Amendment claims). The analysis involves both an objective and a subjective component.[3] *See Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014). Defendants challenge Perry's pleading of and ability to prove the subjective component of his claims. Defs.' Mem. 8, 13.

Subjectively, a prisoner must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish a culpable state of mind for a failure to protect claim, there must be "evidence suggesting that the prison official had actual knowledge of an excessive risk to the [inmate's or detainee's] safety." *Danser*, 772 F.3d at 347. That is, there must be evidence that prison officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that the officials drew the inference. *Raynor v. Pugh*, 817 F.3d 123, 128 (4th Cir. 2016). And, as with claims for failure to protect, this Court considers subjective awareness in analyzing claims of deliberate indifference to serious medical

---

[3] In Perry's view, only the objective standard applies when a pretrial detainee claims failure to protect or deliberate indifference to serious medical needs, as he does here. Pl.'s Opp'n 6, 12. It is true that, in *Kingsley v. Hendrickson*, the Supreme Court noted that the Fourteenth Amendment's Due Process Clause "protects a pretrial detainee from the use of excessive force that amounts to punishment" and held that when a pretrial detainee claims excessive force, "the appropriate standard . . . is solely an objective one," and therefore "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable," and need not "take[] into account [the] defendant's state of mind." ⸺ U.S. ⸺, 135 S. Ct. 2466, 2472–73 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)); *see also Dilworth v. Adams*, 841 F.3d 246, 255 (4th Cir. 2016) (quoting *Kingsley*, 135 S. Ct. at 2472–73). But neither this Court nor the Fourth Circuit has applied *Kingsley* to a pretrial detainee's claim of failure to protect or deliberate indifference to a serious medical need, where there are no allegations of force applied by the defendants.

7

needs. *E.g.*, *Huffman v. Schevel*, No. GJH-16-514, 2018 WL 4599648, at *6 (D. Md. Sept. 24, 2018) ("When evaluating the constitutionality of a pretrial detainee's claim, a court must determine whether the government acted in a deliberately indifferent manner to the detainee's serious medical needs. *Harris*, 240 F.3d at 388. A plaintiff must first show that, objectively, the alleged deprivation is sufficiently serious so as to violate the Fourteenth Amendment. *Wilson v. Setter*, 501 U.S. 294, 298 (1991). . . . Next, a plaintiff must show Defendants acted with 'deliberate indifference' to the right. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)."); *Mondowney v. Baltimore Cty. Det. Ctr.*, No. ELH-16-3932, 2018 WL 4333750, at *11 (D. Md. Sept. 11, 2018) ("A claim of denial of adequate medical care, whether lodged under the Eighth Amendment or the Fourteenth Amendment, requires a court to analyze the same issue: whether there was deliberate indifference to a serious medical need. *See Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) ('The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee.') (citing *Martin v. Gentile,* 849 F.2d 863, 871 (4th Cir. 1988)).").

<u>Failure to Protect</u>

Defendants argue that Perry fails to allege that any of the Defendants knew about his cooperation against the BGF or that he was targeted by the BGF last time he was incarcerated. Defs.' Mem. 8–9. Maybe so, but more significant is what Perry does allege: Bunn "received information" on August 29, 2015 that Perry "would be targeted by BGF," Second Am. Compl. ¶ 27; Giles, Moore, and Hines investigated; and as a result, Brown, Giles, and Hines transferred Perry to BCDC, on Barnes's order, *id.* ¶ 28. He similarly alleges that "Barnes, Brown, Bunn, Giles, Hines, and Moore had actual knowledge that BGF members had planned to fight with . . . Mr. Perry, on the night of August 29, 2015." *Id.* ¶ 30. And, he claims that, despite this knowledge,

8

these Defendants "moved Mr. Perry to another building," where he was "housed him with the general population" in a dorm with an open floor plan, "without ensuring he would be protected from the BGF at the new location" or determining whether any BGF members were housed there. *Id.* ¶¶ 2, 31. Then, "[w]ithin thirty minutes of his arrival inside his new dorm," he "was brutally attacked by several BGF members." *Id.* ¶ 2; *see id.* ¶¶ 34–35.

Thus, he alleges that Defendants had actual knowledge that a known violent prison gang with many members at BCDC planned to attack Perry. At the pleadings stage, at least, that is a sufficient allegation that "the prison official[s] had actual knowledge of an excessive risk to [Perry's] safety." *See Danser*, 772 F.3d at 347. Certainly, actual knowledge of a substantial risk does not necessarily result in liability. If a prison official responded reasonably to a risk, he "may be found free from liability . . . ." *Farmer*, 511 U.S. at 844.[4] In Defendants' view, Perry's allegations that Defendants investigated and moved Perry in response to information they learned about an attack planned by the BGF (e.g., Second Am. Compl. ¶ 28) are a concession that Defendants actually took action to protect Perry, such that he fails to state a failure to protect claim against them. Defs.' Mem. 11.

But, the requirement is a *reasonable* response. *See Farmer*, 511 U.S. at 844. As Perry argues, "that Defendants responded in some manner to the threats against Mr. Perry does not mean that they were not deliberately indifferent to the serious risk of physical harm in the manner in which they responded." Pl.'s Opp'n 11. Defendants clearly knew of the risk to Perry if he were

---

[4] For example, "prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." *Raynor v. Pugh*, 817 F.3d 123, 128 (4th Cir. 2016). But, if the officer "had a reasonable opportunity to act and 'simply refused to do so,'" the officer's failure to intervene during an assault may give rise to liability under § 1983. *Id.* (citation omitted).

housed with BGF members; otherwise they would not have moved him when they learned of the threat. And, Perry alleges sufficiently that they knew that BGF members were present at BCDC. In other words, they knew that Perry was at risk in the general population at BCDC, yet they moved him there anyhow. Based on Perry's allegations, Defendants did not respond reasonably to the risk so as to avoid liability. *See Farmer*, 511 U.S. at 844. With these allegations, even under the more demanding subjective standard for establishing a Fourteenth Amendment violation for failure to protect, Perry sufficiently states his failure to protect claims against Defendants Barnes, Brown, Bunn, Giles, Moore and Hines. *See Farmer*, 511 U.S. at 834; *Raynor*, 817 F.3d at 128; *Danser*, 772 F.3d at 347.

Deliberate Indifference to Serious Medical Needs

Defendants do not dispute that Perry had a serious medical need that was apparent. They argue that Perry fails to allege that the nurse asked Ogbonna or McNeely in particular to call 911 or that these Defendants "denied treatment to Perry, or interfered with his treatment." Defs.' Mem. 16. It is true that it is not clear from the pleadings that Ogbonna and Neely were among the officers that the nurse "informed . . . that they needed to call 911 and get Mr. Perry to the hospital immediately." Second Am. Compl. ¶ 38. Perry has alleged, however, that

> [d]espite the recommendation from a medical professional that they needed to call 911, and despite knowing that Mr. Perry had suffered a head injury that required a CT scan, was bleeding, and was in considerable pain, BCDC personnel — including, upon information and belief, Defendants Remigius Ogbonna and Cynthia McNeely — did not call an ambulance. Instead, they interrogated Mr. Perry about the identities of his attackers for almost two hours.

*Id.* ¶ 39. Thus, regardless what they were told by the medical providers, Defendants questioned Perry for two hours while he "was bleeding, and was in considerable pain," conditions that the medical providers had not been able to address, without calling 911 or making any effort to seek medical care for him. This is a sufficient allegation that Defendants "actually knew of" and

10

deliberately "ignored [his] serious need for medical care" to state a deliberate indifference claim under the Fourteenth Amendment. *See Johnson v. Fields*, 616 F. App'x 599, 600 (4th Cir. 2015) (noting that, to state a claim for deliberate indifference to serious medical needs, a pretrial detainee must allege "that the defendants . . . actually knew of and ignored [his] serious need for medical care" (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 575–76 (4th Cir. 2001))).

Defendants also contend that "clinical decisions regarding inmate medical care within the Department are the sole responsibility of responsible health care professionals," such that Perry cannot state a claim against them. Defs.' Mem. 14. Defendants rely on Chapter 10, Medical Autonomy, from the DPSCS *Office of Clinical Services/Inmate Health Administrative Manual* in support of this argument. *See id.*; *see also* Manual Ch. 10, ECF No. 40-3. As noted, Perry has shown by affidavit that Plaintiff has a need for discovery of evidence of the division of responsibilities in order to learn the facts that are required to resolve the matter. *See* Rasinariu Decl. For that reason, I will not consider evidence at this juncture. *See* Fed R. Civ. P. 56(d).

Qualified Immunity

Defendants also argue that they "are protected by qualified immunity from Perry's claims." Defs.' Mem. 17. To determine whether qualified immunity protects a defendant from suit, the Court first considers whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the evidence establishes a violation of a constitutional right, the Court then assesses whether the right was "clearly established" at the time of the events at issue. *Id.* If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability.

11

Defendants argue that the alleged facts do not show that they violated Perry's constitutional rights because "when confronted with information indicating a possible threat to Perry, Defendants promptly investigated the matter and took reasonable measures to protect Perry's safety," and they "ensured that Perry received medical care, and did not interfere with that care." Defs.' Mem. 18. Yet, construed in the light most favorable to Perry (as I am required to do), the factual allegations are to the contrary: Defendants failed to take reasonable steps to protect Perry and were deliberately indifferent to his need to receive additional prompt medical care, in violation of Perry's Fourteenth Amendment Due Process rights. And, the constitutional rights that Defendants allegedly violated certainly were well established. *See McFadden v. Allison*, No. WDQ-08-0154, 2009 WL 3247358, at *5 (D. Md. Oct. 9, 2009) ("A pretrial detainee's Fourteenth Amendment right to be free from excessive force was clearly established as of the July 5, 2006 attack. So too were the rights to be free from prison officials' deliberate indifference to serious medical needs and assaults by other inmates."). Therefore, Defendants are not entitled to qualified immunity. *See Saucier*, 533 U.S. at 201. [5]

### ORDER

For the reasons stated in this Memorandum Opinion and Order, it is, this 5th day of March, 2019, hereby ORDERED that Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 40, treated as a motion to dismiss, IS DENIED. Defendants' answer is due March 22, 2019.

                                                                               /S/
                                                            Paul W. Grimm
                                                            United States District Judge

---

[5] Defendants argue, in a footnote, that any claims against them in their official capacity are barred by the Eleventh Amendment. Defs.' Mem. 19 n.9. Perry does not bring any claims against Defendants in their official capacities, *see* Second Am. Compl., and therefore this issue is moot.